**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RESIDENTIAL WARRANTY SERVICES, INC. and P. NATHAN THORNBERRY, | ) | |
| Plaintiffs, | ) | C.A. No. 24-cv-00744-TMH |
| v. | ) | |
| PORCH.COM, INC. and PORCH GROUP, INC., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

William Edward Green, Jr., HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware – Attorney for Plaintiffs.

Zachary A. McEntyre, Brandon R. Keel, Matthew B. Rosenthal, Caroline M. Buyak, KING & SPALDING LLP, Atlanta, Georgia; Ryan D. Stottmann, Taylor A. Christensen, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware – Attorneys for Defendants.

September 25, 2026
Wilmington, DE

**HUGHES, UNITED STATES CIRCUIT JUDGE, SITTING BY DESIGNATION:**

Pending before the court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (D.I. 19).[1] For the reasons below, the court will grant-in-part and deny-in-part Defendants' Motion.

## I. BACKGROUND

Plaintiff Residential Warranty Services, Inc. (RWS) is an Indiana Corporation that "was in the business of sales, marketing, underwriting, and administration of a wide variety of residential services contracts."[2] (D.I. 16 ¶¶ 8, 15). Prior to the transactions at issue, Plaintiff P. Nathan Thornberry (together with RWS, Plaintiffs) had "100% equity interest" in RWS and other similar entities. (*Id.* ¶ 16). Porch.com, Inc. and Porch Group, Inc. (collectively, Defendants) are Delaware corporations with principal places of business in Seattle, Washington. (*Id.* ¶¶ 10–11).

---

[1] In view of the First Amended Complaint, Defendants' Motion to Dismiss Plaintiffs' original Complaint (D.I. 12) is **DENIED as moot**. *See, e.g.*, *Owens v. Connections Cmty. Support Programs, Inc.*, 840 F. Supp. 2d 791, 794 (D. Del. 2012) ("Defendants' motion to dismiss became moot upon the filing of the amended complaint.").

[2] The facts are taken from Plaintiffs' First Amended Complaint, which the court accepts as true in deciding Defendants' motion to dismiss. *See* D.I. 16; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

A. The Agreements

On February 28, 2022, the parties entered into a Purchase Agreement that covered three separate transactions. (*Id.* ¶¶ 17–19; *see* D.I. 16-1 at 10–12).[3] Only the "Sale of the First Closing Purchased Interests" is relevant to this opinion. (D.I. 16-1 at 11–12, § 1.2). Under the Purchase Agreement, Defendants would acquire "certain of Plaintiffs' interests in various entities and assets," while Plaintiffs would retain others. (D.I. 16 ¶ 17; *see also* D.I. 16-1 at 10 ("RWS also conducts certain businesses that are unrelated to the Business [as defined under the Purchase Agreement], which unrelated businesses the [Plaintiffs] wish for RWS to retain following the consummation of the transactions contemplated by this Agreement.")).

Under the Purchase Agreement, Defendants agreed to provide Plaintiffs monthly "Contingent Consideration Payments"—which were payments based on Defendants' income from the installation warranty business—for 4.5 years after closing. (D.I. 16 ¶¶ 33–35; *see also* D.I. 16-1 at 13, §§ 2.1.4, 2.1.5; *id.* at 18–20, § 2.5.2; *id.* at 56–59, § 5.7). The payments were split into two categories: those stemming from profits from installation warranties with "the home improvement giant, Lowe's," and those stemming from non-Lowe's installation warranties. (D.I. 16 ¶¶ 33–34). These Contingent Consideration Payments were not guaranteed, but Defendants could not "take or fail to take any action with the primary purpose of avoiding or

[3] Except for the parties' briefing on this dispute, all page numbers cited herein refer to those designated by ECF.

preventing [Plaintiffs] from earning any Contingent Consideration Payment." (*Id.* ¶ 35 (quoting D.I. 16-1 at 56, § 5.7.1)). The Purchase Agreement also required Defendants to calculate Contingent Consideration Payments monthly and send Plaintiffs a "good faith estimate of (A) the Contingent Consideration Net Profit . . . ., (B) the portion of the Contingent Consideration Net Profit attributable to the Lowe's Installation Warranties, (C) the portion of the Contingent Consideration Net Profit attributable to the Non-Lowe's Installation Warranties, and (D) the amount of any Contingent Consideration Payment" (collectively, the Contingent Consideration Determinations). (*Id.* ¶ 34; *see* D.I. 16-1 at 18–19, § 2.5.2(i)).

Additionally, under the Purchase Agreement, Plaintiffs agreed to indemnify Defendants for various types of claims, including certain Third-Party Claims and Non-Third Party Claims as defined under the Purchase Agreement (generally, Indemnification Claims). (*See* D.I. 16-1 at 84–85, § 12.2; *id.* at 85–88, § 12.4; *see also* D.I. 16 ¶¶ 24–25). The Purchase Agreement also laid out notification procedures and mechanisms for disputing these Indemnification Claims. (D.I. 16-1 at 85–88, § 12.4). One type of claim that constituted an Indemnification Claim was any "claim[ ] made by [Plaintiffs'] customers within twelve months after the Closing Date under warranties and other products sold by Plaintiffs before the Closing Date." (D.I. 16 ¶ 24). For these, Plaintiffs agreed to indemnify Defendants for payments made to these customers if they exceeded $2,100,000 (Excess Claims). (*Id.* ¶ 25).

Under a separate agreement, entered into on April 1, 2022 (the Side Letter Agreement), Defendants agreed to provide Plaintiffs a monthly report "detailing the

payments to customers of the Purchased Companies made during such prior month.”. (*Id.* ¶ 26 (quoting D.I. 16-1 at 323–24, ¶ 2)).

The parties also entered into an Escrow Agreement. (*Id.* ¶28; *see* D.I. 16-1 at 329–44). Under the Purchase Agreement and Escrow Agreement, $1,000,000 of the closing price was placed in an escrow account (Escrow Amount), where it was to remain for 24 months following closing. (D.I. 16 ¶ 28; *see* D.I. 16-1 at 12–13, § 2.1.1; *id.* at 329, § 2(a); *see also id.* at 98 (defining the escrow period)). Subject to any outstanding or unresolved Indemnification Claims, the parties were obligated to agree to the release of the Escrow Amount within two days after the escrow period expired. (D.I. 16 ¶ 30; *see also* D.I. 16-1 at 91–92, § 12.7.1; *id.* at 330, § 4(a)).

Additionally, prior to entering into the aforementioned contracts, Defendants represented to Plaintiff Thornberry “that he would receive options to purchase 130,000 shares of Porch common stock valued at $1 million in exchange for Plaintiffs not pursuing litigation against Porch for its alleged improper solicitation of inspection companies with whom RWS had a contractual business relationship.” (D.I. 16 ¶ 20). On a second occasion, Defendants offered Plaintiff Thornberry the option to purchase additional shares of Porch stock in exchange for Plaintiff “Thornberry enter[ing] into an Amended Advisory Agreement” and RWS agreeing to settle Plaintiffs’ ongoing litigation with a separate company Defendants were interested in acquiring. (*See Id.* ¶ 21 (Plaintiff Thornberry “would receive options to purchase 20,000 of shares of Porch stock valued at $700,000 if RWS agreed to settle” the lawsuit against the other company)). Accordingly, the parties entered into the Amended Advisory Agreement

and Plaintiffs settled their lawsuit, but Plaintiff Thornberry did not receive any stock award. (*Id.* ¶¶ 21–23; *see also* D.I. 16-1 at 320–21).

B. Post-Closing Disputes

Following the closing of, and pursuant to, the Purchase Agreement, in November 2023, Defendants notified Plaintiffs of Excess Claims that Defendants alleged were owed, but Defendants did not state that they were officially asserting a Non-Third Party Claim against Plaintiffs. (D.I. 16 ¶ 42). Rather, Defendants informed Plaintiffs that they had paid $2,661,616.45 in warranty claims to customers who fell under Plaintiffs' indemnity obligation, meaning $561,616.45 constituted Excess Claims that Plaintiffs were responsible for under the Purchase Agreement. (*Id.*). Defendants documented these allegations in a spreadsheet provided to Plaintiffs, titled "Final Claims Analysis RWS Inc to RWS of A Indemnity 11.13.23." (*Id.*). Plaintiffs immediately disputed the alleged Excess Claims and requested more detailed information for auditing purposes, which Defendants did not sufficiently provide. (*Id.* ¶ 42–44).

Then, on March 27, 2024, at the end of the escrow period, Plaintiffs emailed Defendants a signed written release so that the Escrow Amount could be paid out. (*Id.* ¶ 31). Defendants did not sign the release. (*Id.* ¶¶ 31–32). Rather, on March 29, 2024, Defendants submitted a letter officially notifying Plaintiffs of several Non-Third Party Claims, including the Excess Claims, under § 12.4.1 of the Purchase Agreement. (*Id.* ¶ 47–48; *see* D.I. 16-1 at 346–49 ("Pursuant to Section 12.4.1 of the Purchase Agreement, [Defendants] hereby notify [Plaintiffs] of certain Non-Third

Party Claims."); *see also id.* at 85–86, § 12.4.1 (describing indemnification claim procedures for Non-Third Party Claims)). Defendants' claim letter also alleged breaches of the Purchase Agreement, including a breach of the non-solicitation provision.[4] (*See* D.I. 16-1 at 346–47).

Given the outstanding and unresolved Indemnification Claims (i.e., the Excess Claims and the non-solicitation claim), Defendants refused to release the Escrow Amount. (*See* D.I. 16 ¶¶ 32, 51). Plaintiffs disputed the claims in compliance with § 12.4.1(b) of the Purchase Agreement, requested more supporting documentation, and sent their own Non-Third Party Claim letter alleging Defendants were in breach of several obligations under the Purchase Agreement. (*Id.* ¶¶ 52–53). The parties' attempts to resolve these disputes were unsuccessful. (*See id.* ¶¶ 56–57).

C. The Present Litigation

Plaintiffs commenced this action on June 24, 2024, (D.I. 1), and later amended their complaint on September 30, 2024, (D.I. 16). Plaintiffs' First Amended Complaint alleges that Defendants have breached several obligations under various agreements, such as the Purchase Agreement, the Escrow Agreement, the Side Letter Agreement, and the Amended Advisory Agreement. (D.I. 16 ¶¶ 70, 88, 91–92, 101).

[4] For the non-solicitation claim, Defendants alleged Plaintiffs breached the Purchase Agreement "by persuading or seeking to persuade" an employee named Justin Thacker, who was a "Restricted Person" under the agreement, to end his relationship with Defendants and return to work with Plaintiffs. (D.I. 16-1 at 347; *see* D.I. 16 ¶ 32).

Plaintiffs' First Amended Complaint further alleges that Defendants have unfairly competed with Plaintiffs. (*Id.* ¶¶ 103–11).

On November 15, 2024, Defendants filed the present motion to dismiss, seeking to dismiss all five counts of the First Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP). (D.I. 19; D.I. 20). Alternatively, Defendants seek to strike Plaintiffs' jury demand. (D.I. 20 at 19–20). Neither party has requested oral argument, and the motions are fully briefed and ripe for review. (D.I. 20; D.I. 22; D.I. 23). This court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, parties may move to dismiss a complaint for failure to state a claim upon which relief can be granted. While a complaint challenged by a Rule 12(b)(6) motion need not contain "detailed factual allegations," it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

When presented with a motion to dismiss for failure to state a claim, courts conduct a two-part analysis. *See Fowler*, 578 F.3d at 210. First, courts "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Courts also must draw all reasonable inferences in favor of the non-moving party but are not required to accept as true "unsupported

conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997).

Second, courts determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

## III. DISCUSSION

Plaintiffs' First Amended Complaint contains five counts: three based on breach of contract (Count I, Count III, and Count IV), one seeking declaratory judgment (Count II), and one alleging unfair competition (Count V). (D.I. 16 ¶¶ 59–111). Within the breach of contract counts, Plaintiffs refer not only to breaches of specific contract provisions, but also to breaches of the implied covenant of good faith and fair dealing. (*See, e.g.*, *id.* ¶¶ 90–92).

### A. Breach of Contract

Under Delaware law, "to survive a motion to dismiss for failure to state a breach of contract claim, [a] plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by

that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003).[5]

1. Count I – Breaches Related to Escrow Obligations

Plaintiffs' breach of contract claims under Count I concern the parties' escrow-related obligations under the Purchase Agreement, the Escrow Agreement, and the Side Letter Agreement. (*See* D.I. 16 ¶¶ 59–72). The parties do not dispute the existence of these contracts. Plaintiffs allege breach of multiple obligations.

a. Breach of Defendants' Obligation to Release Escrow Amount Under the Purchase Agreement

Count I asserts a breach of contract claim based on Defendants' refusal to release the Escrow Amount under the Purchase Agreement. (D.I. 16 ¶¶ 59–62, 66–67, 70–72). Plaintiffs allege that, under § 12.7.1 of the Purchase Agreement, "the parties were obligated to jointly agree to the release of the Escrow Amount within two business days after the Escrow Period." (*Id.* ¶ 62; *see* D.I. 16-1 at 91–92, § 12.7.1). Yet Defendants have refused to do so, and Plaintiffs question the merits of the Indemnification Claims on which Defendants justify their refusal, i.e., the unresolved Excess Claims and the alleged breach of the non-solicitation provision. (D.I. 16 ¶¶ 66, 70–72).

[5] The Purchase Agreement, Escrow Agreement, and Side Letter Agreement are governed by Delaware law. (D.I. 16-1 at 111, § 14.2; *id.* at 335, § 10(d); *id.* at 324, ¶ 3). The parties do not argue that any other agreements are governed by another state's laws.

Defendants argue for dismissal because, under the plain language of the Purchase Agreement, Plaintiffs are not entitled to the Escrow Amount while Indemnification Claims remain unresolved. (D.I. 20 at 6). Defendants point to § 12.7.1 of the Purchase Agreement, which states:

> 12.7.1 General. No later than two (2) Business Days after the expiration of the Escrow Period (the "Escrow Release Date"), the Purchaser and the Sellers shall deliver a joint, written letter to the Escrow Agent instructing the Escrow Agent to pay and distribute all of the funds then remaining in the Escrow Account to the Sellers, ***unless any outstanding claim for indemnification under Section 12.2 is still pending and unresolved,*** in which case an amount of the Escrow Amount representing a reasonable quantification of the amount of indemnifiable Losses relating to any pending and unresolved claim for indemnification under Section 12.2 will be retained by the Escrow Agent (the "Retained Amount"), and the balance paid to the Sellers. ***Any Retained Amount shall remain in the Escrow Account until released to a Purchaser Indemnified Party (or its designee) in satisfaction of an outstanding claim*** or as set forth in Section 12.7.2 below.

(D.I. 16-1 at 91–92 (emphases added)). They argue that under § 12.7.1, since unresolved Indemnification Claims exist (which Plaintiffs acknowledge), Plaintiffs are not yet entitled to the funds in escrow, and therefore Defendants have not breached. (D.I. 20 at 6–7). According to Defendants, Plaintiffs seek to challenge the "underlying merits of the indemnification claims" to get around the plain language of the Purchase Agreement. (D.I. 20 at 7). For example, Plaintiffs deny violating the Purchase Agreement's non-solicitation provision, claiming that there was an

understanding as to the at-issue employee's commitment to Defendants.[6] (D.I. 16 ¶ 32). But Defendants argue that any such understanding was not reflected in the Purchase Agreement, which also contains a merger clause that supersedes "[a]ny prior agreements, promises or negotiations not expressly set forth." (D.I. 20 at 8 (first citing D.I. 16-1 at 53, § 5.5.3 (non-solicitation provision); and then citing *id.* at 113–14, § 14.10 (merger clause))). Ultimately, Defendants argue that the merits of the underlying Indemnification Claims are "irrelevant" to the present motion to dismiss. (D.I. 20 at 7).

Plaintiffs disagree, explaining they filed this action "to resolve the outstanding indemnification claims, so that Defendants will release the escrow," and contend that the merits of the underlying Indemnification Claims are "highly relevant." (D.I. 22 at 6 (citing D.I. 16 ¶¶ 56–57)). Otherwise, "parties acting in bad faith could simply raise sham indemnification claims to justify withholding the escrow." (*Id.*). Plaintiffs therefore contend that Defendants' reading of § 12.7.1 cannot be correct. (*Id.*).

Accepting the First Amended Complaint's factual allegations as true and drawing all reasonable inferences in favor of the non-moving Plaintiffs, *Schuylkill*, 113 F.3d at 417, this court finds that Plaintiffs have pled a plausible claim for relief.

---

[6] Specifically, Plaintiffs assert that Defendants "knew well that Justin Thacker—who is a relative of Thornberry and with whom much of his family worked and continues to work for RWS—would work for Porch for a limited time to assist with the integration of RWS's and Porch's systems but was expected, absent Porch and Justin independently coming to an agreement to extend his employment with Porch, to return to work for RWS thereafter." (D.I. 16 ¶ 32).

Plaintiffs allege the existence of a valid contract, the Purchase Agreement, which required that Defendants release the escrow amount on the agreed-upon date with some exceptions. (D.I. 16 ¶¶ 59–62, 66–67, 70–72; *see also id.* ¶¶ 28–32). And, if Plaintiffs' allegations regarding the merits of the underlying Indemnification Claims are true, they support a plausible claim of breach. (*See id.* ¶¶ 24–32, 42–44, 47–55, 59–72). The resolution of these issues would benefit from further record development and will likely involve fact-finding, which the court finds improper for this stage. *See Cmty. Legal Aid Soc'y, Inc. v. Adult & Prison Educ. Res. Workgroup*, No. 24-cv-00615, 2025 WL 1734992, at *10 (D. Del. June 23, 2025) (declining to decide issues Defendants raised in their motion to dismiss because they were "factual disputes that are not properly addressed on a motion to dismiss for failure to state a claim").

The parties also disagree on the meaning and effect of § 12.7.1, and both sides present reasonable interpretations. (*Compare* D.I. 20 at 6–7 (Defendants reading § 12.7.1 such that any unresolved indemnification claim, regardless of its merits, permits the withholding of escrow), *with* D.I. 22 at 6 (Plaintiffs reading § 12.7.1 such there must be merit behind the Indemnification Claims to permit withholding escrow)). The court believes these issues are better suited for resolution after discovery so that it can best effectuate the meaning the parties intended when entering the agreement. *See, e.g.*, *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014) (denying motion to dismiss based on defenses that require contract interpretation); *Lorillard Tobacco Co. v. Am.*

*Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("When interpreting a contract, the role of a court is to effectuate the parties' intent.").

Ultimately, Plaintiffs' allegations suffice, at this stage, to maintain their claim that Defendants are in breach of the Purchase Agreement by failing to release the funds in escrow. *See VLIW*, 840 A.2d at 612. Defendants' motion as to this claim is denied.

b. Breach of Defendants' Obligation to Release Escrow Amount Under the Escrow Agreement

Count I also asserts a similar claim as to Defendants' refusal to release the Escrow Amount, but under a breach of § 4(a) of the Escrow Agreement. (D.I. 16 ¶ 62; *see also* D.I. 16-1 at 330, § 4(a)). The parties rely on the same arguments as they do for the similar claim of breach under the Purchase Agreement. (*See* D.I. 20 at 6–8; D.I. 22 at 5–8). As such, for the reasons explained above in Part III.A.1.a, Plaintiffs' allegations suffice, at this stage, to maintain their claim that Defendants are in breach of the Escrow Agreement by failing to release the funds in escrow. Defendants' motion as to this claim is also denied.

c. Breach of Defendants' Obligations Regarding Notice and Supporting Documentation Under the Purchase Agreement

Plaintiffs also assert that Defendants breached their obligation under § 12.4.1 of the Purchase Agreement, which required Defendants to provide prompt written notice of any Non-Third Party claims they sought to assert, to describe the claim in "reasonable detail," and include "copies of all material written evidence thereof."

(D.I. 16 ¶¶ 64–65; *see also* D.I. 16-1 at 85–86, § 12.4.1). Defendants failed to do this, and Plaintiffs allege they were materially prejudiced by the lack of documentation "sufficient for Plaintiffs to audit and verify the [Excess Claims]" asserted against them. (D.I. 16 ¶ 65).

Defendants assert that Plaintiffs' claim alleging insufficient documentation supporting the Excess Claims fails, because Defendants did provide documentation and Plaintiffs do not point to a contractual provision that deems the provided documentation deficient. (D.I. 20 at 7–8; *see also id.* at 9–10). Defendants further argue that regardless, any dispute as to the sufficiency of the documentation would not release Plaintiffs' obligation to indemnify Defendants for the Excess Claims, because failure to provide sufficient documentation is not considered a material breach under § 12.4.2 unless Plaintiffs are "materially prejudiced" by Defendants' failure. (*Id.* at 7–8). And Defendants say that Plaintiffs do not sufficiently allege material prejudice. (*Id.*). Plaintiffs dispute Defendants' reading of § 12.4.2 and argue they were materially prejudiced: without proper documentation, Plaintiffs were unable to audit and verify the accuracy of Defendants' Excess Claims, and therefore they cannot adequately dispute or defend against them. (D.I. 22 at 7–8).

This claim also survives dismissal, as Plaintiffs' factual allegations give rise to a plausible claim for relief. *See VLIW*, 840 A.2d at 612. Plaintiffs allege a breach of a valid contract via Defendants' failure to provide sufficient documentation to support their asserted Indemnification Claims. (D.I. 16 ¶¶ 64–65, 70–72; *see also id.* ¶¶ 24–32, 42–44, 47–52). And these claims are what the Defendants use to justify

their refusal to release the Escrow Amount. (*Id.* ¶¶ 59–65, 70–72). The First Amended Complaint also alleges how and why the documentation that was received was insufficient, and how it harmed Plaintiffs by preventing their ability to verify the veracity of the Indemnification Claims to dispute them. (*See* D.I. 16 ¶¶ 42–44, 48–51, 64–65).

Furthermore, the parties' arguments regarding the meaning and applicability of § 12.4.2, and whether the situation falls within the material prejudice exception, "involve disputed issues of fact and contract interpretation not suitable to resolution on a motion to dismiss." *Universal*, 61 F. Supp. 3d at 400. Defendants' motion regarding this claim is also denied.

d. Breach of Defendants' Obligations Regarding Notice and Supporting Documentation Under the Side Letter Agreement

Similarly, Plaintiffs assert that Defendants breached their obligations to provide detailed monthly reports regarding Indemnification Claims as required under ¶ 2 of the Side Letter Agreement. (D.I. 16 ¶ 63; *see also* D.I. 16-1 at 323–24, ¶ 2). The parties rely on the same arguments presented for the breach of the Purchase Agreement's similar notice and documentation-based provisions. (*See* D.I. 20 at 6–8; D.I. 22 at 5–8). As such, for the reasons explained in Part III.A.1.c, the Defendants' motion to dismiss as to this claim is denied.

e. <u>Breach of Implied Duty of Good Faith and Fair Dealing Based on Escrow Obligation Related Conduct</u>

Count I also includes a claim alleging Defendants "breached the implied covenant of good faith and fair dealing." (D.I. 16 ¶ 69). Plaintiffs allege that Defendants' "actions were taken in bad faith to deny Plaintiffs the benefit of their bargain." (*Id.* ¶ 68). But Defendants argue for dismissal because Plaintiffs' allegations of breach are covered by the contract. (D.I. 20 at 18–19 (asserting that a "claim for breach of the implied covenant does not arise where 'the subject at issue is expressly covered by the contract.'" (quoting *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 20 (Del. Ch. 2009)))). Defendants further argue that Plaintiffs fail to identify a specific implied obligation that was breached. (D.I. 20 at 19).

Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract. *See Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007). "To sufficiently allege a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) a specific obligation implied in the contract, (2) a breach of that obligation, and (3) resulting damages." *Sports Med. Rsch. & Testing Lab'y v. Labware, Inc.*, No. 24-cv-00516, 2025 WL 315352, at *1 (D. Del. Jan. 28, 2025) (citation omitted). A plaintiff, however, "cannot assert a claim for breach of implied covenants of good faith and fair dealing that is based on exactly the same acts which are said to be in breach of express covenants." *Mosiman v. Madison Cos., LLC*, No. 17-cv-01517, 2019 WL 203126, at *3 (D. Del. Jan. 15, 2019) (citation omitted).

Plaintiffs' Count I implied covenant claim is based on the same escrow obligation-related conduct that underlies the other express breach of contract claims brought under Count I, and Plaintiffs fail to otherwise show how the factual bases differ. (*See* D.I. 16 ¶ 69). The claims are impermissibly duplicative, which warrants dismissal. *See, e.g.*, *Cision US, Inc. v. CapTech Ventures, Inc.*, No. 24-cv-00063, 2025 WL 1094318, at *5 (D. Del. Apr. 11, 2025); *Mosiman*, 2019 WL 203126, at *3 ("Because Plaintiffs' implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim." (cleaned up)). Defendants' motion is granted as to this claim.

* * *

The court therefore denies Defendants' motion to dismiss Count I with respect to Plaintiffs' express breach claims, *see supra* Parts III.A.1.a–d, and grants Defendants' motion to dismiss Count I with respect to Plaintiffs' claim based in a breach of the implied covenant of good faith and fair dealing, *see supra* Part III.A.1.e.

2. <u>Count III — Breaches Related to Contingent Consideration Obligations</u>

Plaintiffs' breach of contract claims under Count III concern the parties' Contingent Consideration-related obligations under the Purchase Agreement. (*See* D.I. 16 ¶¶ 76–96). Again, Plaintiffs allege that Defendants breached multiple obligations.

a. Breach Related to Contingent Consideration Payments

Under Count III, Plaintiffs assert a breach of sections 2.1.4, 2.1.5, 2.5.2(iii), and 5.7 of the Purchase Agreement based on Defendants' alleged failure to pay Plaintiffs their owed Contingent Consideration Payments. (D.I. 16 ¶¶ 76–96). According to Plaintiffs, Defendants continue to do business that should have resulted in Plaintiffs receiving Contingent Consideration Payments, yet they have not been received. (*See id.* ¶¶ 85–86 (alleging that Defendants announced their warranty business had grown in profitability, yet withheld Contingent Consideration Payments to "maximize their own profit")). This, Plaintiffs allege, violates §§ 2.1.4, 2.1.5, and 2.5.2(iii). (*Id.* ¶ 91). Plaintiffs also allege that their access to the services they had been "using to process Lowe's claims" was revoked and that, "on information and belief, [the third-party service provider], on behalf of [Defendants], then stopped sending purchase orders in support of the Contingent Consideration Payments for the Lowe's Installation Warranties." (*Id.* ¶ 81). This and other conduct, Plaintiffs allege, also violates Defendants' obligation under § 5.7.1 to not "take, or fail to take any action with the primary purpose of avoiding or preventing [Plaintiffs] from earning any Contingent Consideration Payment." (*Id.* ¶¶ 80–94).

Defendants argue there was no breach of the Purchase Agreement. (D.I. 20 at 10–13). According to Defendants, Plaintiffs "fail[ ] to recognize the narrow obligations [Defendants] had with respect to Contingent Consideration." (*Id.* at 11). Defendants' only Contingent Consideration Payment related obligation, they argue, was to not "tak[e] or fail[ ] to take any action *with the primary purpose* of avoiding or

preventing the [Plaintiffs] from earning any Contingent Consideration Payment" contemplated by the Purchase Agreement. (*Id.* at 11 (emphasis added) (quoting D.I. 16-1 at 56, § 5.7.1)). And Defendants argue that Plaintiffs fail to allege facts showing their conduct was for the "primary purpose" of avoiding payment. (*Id.* at 11–12).

Plaintiffs argue that they need not allege facts that show intent at this stage because doing so is fact-intensive and best left to later in the proceedings. (D.I. 22 at 12). According to Plaintiffs, they have satisfied "Delaware's notice pleading standards," by pleading "reasonably conceivable facts" that Defendants breached § 5.7.1. (*Id.* at 13 (citing D.I. 16 ¶¶ 36–40)). But according to Defendants, Plaintiffs rely on an incorrect standard because the Purchase Agreement requires Plaintiffs to plead facts that raise an inference that Defendants acted with the "primary purpose" of avoiding payment to establish breach. (D.I. 23 at 4–5; *see* D.I. 16-1 at 56, § 5.7.1).

The court finds that dismissal of this claim is unwarranted. Plaintiffs' alleged facts, drawing all reasonable inferences in their favor, are sufficient for this court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As Plaintiffs allege, the Contingent Consideration Payments decreased "in amount and frequency" over the applicable period, yet Defendants' "warranty business had become more profitable" during the relevant time. (*See* D.I. 16 ¶¶ 33–41, 76–96). That lack of payment is harmful. (*See id.* ¶ 96). Plaintiffs also allege a plausible reason behind the revocation of their access to view and process claims during this time which, if true, could support a claim for breach

under § 5.7.1. (*See id.* ¶ 81 (noting purchase orders impermissibly ceased being sent to Lowe's after Plaintiffs' access was revoked, suggesting that access was revoked to prevent Plaintiffs from confirming they were not receiving Contingent Consideration Payments owed to prevent providing payment)). *See VLIW*, 840 A.2d at 612.

Considering all of Plaintiffs' allegations together and drawing reasonable inferences in their favor, (D.I. 16 ¶¶ 33–41, 76–96), this court concludes that Plaintiffs present a plausible claim that Defendants breached their Contingent Consideration Payment obligations under the Purchase Agreement and therefore have satisfied their burden for this stage of these proceedings. *Iqbal*, 556 U.S. at 678. Defendants' motion to dismiss this claim is denied.

b. Breach Related to Contingent Consideration Determinations

Under this count, Plaintiffs also assert a claim regarding Defendants' alleged breach of obligations under sections 2.5.2(i) and 5.7 of the Purchase Agreement based on their failure to send Plaintiffs the required monthly Contingent Consideration Determinations. (D.I. 16 ¶¶ 76–79, 81, 88, 92). Plaintiffs allege that Defendants were obligated under the Purchase Agreement to calculate Contingent Consideration Payments monthly and send Plaintiffs a "report containing a good faith estimate" of various calculations relevant to Plaintiffs' share—i.e., the Contingent Consideration Determinations. (*Id.* at ¶ 79; *see* D.I. 16-1 at 18–19, § 2.5.2(i)). Yet, according to Plaintiffs, Defendants did not send these Contingent Consideration Determinations. (*See* D.I. 16 ¶¶ 33–41, 76–96).

Defendants cursorily argue that this claim should also be dismissed. (D.I. 20 at 11 ("The mere fact that [Plaintiffs] stopped receiving payments *or related determinations for payments* . . . would not establish a breach of the Purchase Agreement." (emphasis added))). Defendants do not otherwise specifically challenge this Contingent Consideration Determinations-based claim. (*See* D.I. 20 at 10–12).

Plaintiffs have satisfied their burden to survive dismissal. As noted above, the Plaintiffs allege an obligation that Defendants did not comport with. (D.I. 16 ¶¶ 76–79, 81, 88, 92). The court also notes that Defendants' arguments regarding § 5.7.1—that Plaintiffs must allege facts demonstrating Defendants took or failed to take action with the "primary purpose" of preventing payments—do not appear to apply to Defendants' obligation to submit Contingent Consideration Determinations monthly. Section 5.7.1 discusses obligations related to the Contingent Consideration Payments but does not mention any obligations under § 2.5.2(i), which governs the Contingent Consideration Determination obligations. (*See* D.I. 16-1 at 56, § 5.7.1). But again, the court believes it is best to leave contract interpretation for a later time. *See Universal*, 61 F. Supp. 3d at 400.

The court finds that Plaintiffs have pled facts sufficient to support a plausible inference that Defendants breached their obligations under the Purchase Agreement pertaining to the Contingent Consideration Determinations.

c. <u>Breach of Implied Duty of Good Faith and Fair Dealing</u>

Under Count III, Plaintiffs also claim breach of an implied duty of good faith and fair dealing based on Defendants' Contingent Consideration-related conduct.

(D.I. 16 ¶¶ 89–90, 95–96). The parties' arguments are the same as those for the implied duty claim of Count I and the same standards apply. *See supra* Part III.A.1.e.

Plaintiffs' good faith and fair dealing claim under Count III is impermissibly duplicative of their other Count III breach of contract claims based on Contingent Consideration obligations. As with Count I's implied duty claim, dismissal is warranted. *See, e.g.*, *Cision*, 2025 WL 1094318, at *5.

*  *  *

The court therefore denies Count III of Defendants' motion to dismiss with respect to Plaintiffs' express breach of contract claims, *see supra* Part III.A.2.a–b, and grants Count III of Defendants' motion to dismiss with respect to Plaintiffs' breach of the implied covenant of good faith and fair dealing, *see supra* Part III.A.2.c.

3. Count IV – Breaches Related to Stock Options Obligations

Count IV concerns alleged breaches related to Defendants' representations and promises related to stock options. (*See* D.I. 16 ¶¶ 97–102). Plaintiffs allege that, before entering into the Purchase Agreement, Defendants represented that Plaintiff Thornberry "would receive options to purchase 130,000 shares of Porch common stock valued at $1 million" if Plaintiffs agreed to not pursue litigation against Defendants in connection with a separate dispute. (*Id.* ¶ 20). Additionally, Plaintiffs allege that Defendants offered additional stock options, specifically "20,000 shares of Porch stock valued at $700,000," if Plaintiff Thornberry agreed to enter into the Amended Advisory Agreement and to settle Plaintiffs' separate litigation against another company that Defendants wished to acquire. (*Id.* ¶ 21). According to

Plaintiffs, the parties entered into a Settlement Agreement on March 20, 2018, to this effect. (*Id.*). Further, both stock award representations were also memorialized in the July 25, 2018 Amended Advisory Agreement. (*See id.* ¶ 20; D.I. 16-1 at 320–21). Yet Plaintiffs never received the promised stock awards. (D.I. 16 ¶ 23).

a. Breach of the Amended Advisory Agreement

Under Count IV, Plaintiffs assert a breach of the Amended Advisory Agreement for failing to award Plaintiff Thornberry his promised stock awards. (*See id.* ¶¶ 97–102). Defendants argue that this claim is foreclosed by the Purchase Agreement's merger clause. (D.I. 20 at 13–14). The merger clause states:

> Section 14.10 Entire Agreement. This Agreement, together with the Exhibits and Schedules hereto, and the Transaction Documents ***constitute the sole, exclusive and only agreements of the parties hereto pertaining to the subject matter hereof***, contain all of the covenants, conditions and agreements between the parties, express or implied, whether by statute or otherwise, and sets forth the respective rights, duties and obligations of each party to the other parties as of the date hereof. ***Any prior agreements, promises or negotiations not expressly set forth in this Agreement or the other Transaction Documents are of no force and effect***; provided, however, nothing contained in this Agreement shall affect any confidentiality agreements, non-solicitation/non-servicing agreements or any other type of restrictive covenant agreement that any of the Sellers enters into with the Purchaser or one of its Affiliates, including, but not limited to, the Companies. No oral understandings, oral statements, oral promises or oral inducements exist.

(D.I. 16-1 at 113–14, § 14.10 (emphases added)). Since the Purchase Agreement neither includes any mention of the stock awards nor incorporates the Amended Advisory Agreement, Defendants argue this claim is foreclosed by § 14.10. (D.I. 20 at 13–14). In further support of dismissal, Defendants point to the Purchase Agreement's "No Other Representations and Warranties" provision, (D.I. 16-1 at 47,

§ 4.11 (disclaiming any prior or future representations or warranties except those explicitly made in the Purchase Agreement)), and release provision, (*id.* at 60, § 5.8.1 (releasing liability for all claims)). (*See* D.I. 20 at 14; D.I. 23 at 7–8). Defendants further argue that, even if not foreclosed, the Amended Advisory Agreement provides that Plaintiff Thornberry is only entitled to the stock awards if "certain conditions" are met. (*See* D.I. 20 at 14–15; D.I. 16-1 at 320 (stating stock options will be issued "subject to and as soon as practicable after approval by the board of directors of [Porch]")). Since the conditions were not met, Defendants argue, there is no breach. (D.I. 20 at 14–15).

Plaintiffs argue that the Purchase Agreement's merger clause does not apply because the Amended Advisory Agreement—the basis of the alleged breach—is separate from and unrelated to the Purchase Agreement and its subject matter. (D.I. 22 at 14–15; *see* D.I. 16-1 at 113–14, § 14.10 (noting Purchase Agreement is the "the sole, exclusive and only agreements of the parties hereto *pertaining to the subject matter hereof*" (emphasis added))). According to Plaintiffs, Defendants also misread the Purchase Agreement's "No Other Representations and Warranties" provision, (*see* D.I. 22 at 15), and that the release provision at § 5.8.1 does not apply because Plaintiffs' claims do not arise "by reason of any matter, fact or cause whatsoever occurring *on or prior to* the Closing Date." (*id.* at 15 (emphasis added) (quoting D.I. 16-1 at 60, § 5.8.1)).

But according to Defendants, the Purchase Agreement's merger clause is not as limited as Plaintiffs suggest because the rest of the clause does not contain such

limiting language. (*See* D.I. 23 at 6 (quoting D.I. 16-1 at 113–14, § 14.10) ("Any prior agreements, promises or negotiations not expressly set forth in this Agreement or the other Transaction Documents are of no force and effect.")). Also, Defendants argue that Plaintiffs' claim is still based on an agreement made before the Purchase Agreement, so it falls within the merger clause's scope. (*Id.* at 7–8).

Once again, the parties' arguments primarily depend on the scope, and thus the interpretation, of several provisions of the Purchase Agreement. (*Compare, e.g.*, D.I. 23 at 6 (arguing merger clause covers more than just agreements between the parties of the Purchase Agreement pertaining to its subject matter), *with, e.g.*, D.I. 22 at 14–15 (arguing the merger clause applies only to agreements between the parties of the Purchase Agreement pertaining to the Purchase Agreement's subject matter)). Determining the subject matter of the Amended Advisory Agreement, which the parties disagree on, may be necessary to resolve this claim. It is unclear currently whether the Amended Advisory Agreement "pertains to the subject matter" of the Purchase Agreement, and the present record does not include the original advisory agreement. These issues are better suited for determination at a later stage, such as summary judgment. *See, e.g.*, *Universal*, 61 F. Supp. 3d at 400 (declining motion to dismiss based on defenses that require contract interpretation).

Because these claims "involve disputed issues of fact and contract interpretation not suitable to resolution on a motion to dismiss," *id.*, the Defendants' motion is denied for this claim.

b. Breach of the Settlement Agreements

Count IV also contains a claim for breach based on Defendants' failure to award Plaintiff Thornberry his promised stock awards under alleged Settlement Agreements. The parties rely on the same allegations and arguments made for the claim for the similar breach claim under the Amended Advisory Agreement. Defendants, however, also deny entering into any agreements titled "Settlement Agreements," and argue that the Amended Advisory Agreement is the only agreement concerning any stock options. (*See* D.I. 20 at 13).

The dispute regarding the existence of any agreements titled "Settlement Agreements" does not compel dismissal. Plaintiffs allege the existence of a valid and enforceable contract, (*see* D.I. 16 ¶¶ 21–23, 98–102), which is enough for the claim to survive the present motion to dismiss. Discovery will also shed more light on this issue. For this reason, and those explained in Part III.A.3.a, the Defendants' motion to dismiss as to this claim is denied.

* * *

The court therefore denies Defendants' motion to dismiss Count IV.

B. Declaratory Judgment

Count II is a claim for declaratory judgment under Del. Code tit. 10, § 6501. (D.I. 16 ¶¶ 73–75). That statute provides that courts have the power to declare rights "whether or not further relief is or could be claimed" and that any "such declaration shall have the force and effect of a final judgment or decree." Del. Code tit. 10, § 6501. "The Delaware declaratory judgment act, like the federal act, requires the existence

of an 'actual controversy' as a jurisdictional prerequisite." *Clemente v. Greyhound Corp.*, 52 Del. 223, 231 (Del. Super. Ct. 1959). And where, as here, dismissal is sought, courts consider "whether the declaratory judgment action would serve a useful purpose." *Id.* at 232; *see Burris v. Cross*, 583 A.2d 1364, 1373 (Del. Super. Ct. 1990). Applying the Delaware Declaratory Judgment Act, courts have concluded that the appropriateness of a declaratory judgment turns on various factors, including whether another remedy exists and, in deciding whether declaratory judgment relief is available, have looked to whether relief may be obtained in another non-declaratory action already available. *Burris*, 583 A.3d at 1372–73.

Plaintiffs seek a declaration that they are entitled to receive documentation necessary to audit and confirm the validity of the Excess Claims under § 12.4.1 of the Purchase Agreement and ¶ 2 of the Side Letter Agreement. (D.I. 16 ¶¶ 73–75). Defendants argue dismissal is warranted for three reasons. (D.I. 20 at 9). First, Defendants argue this count "relies on the same factual allegations as Count I regarding the merits of Porch's indemnification claim for pre-closing warranty payments," and so it should be dismissed for the same reasons. (*Id.*). Second, although Plaintiffs frame the relief sought as a declaration, Defendants argue that they are seeking "an order that Porch failed to comply with the Purchase Agreement," which is improper. (*Id.*). Finally, Defendants argue that they complied with their documentation obligations, and Plaintiffs' perceived deficiencies are unsupported by the terms of the agreements. (*Id.*).

Plaintiffs disagree and contend that Count II seeks relief regarding the rights and obligations of the parties moving forward and thus is not duplicative of Count I, which seeks damages for past breaches of contract. (D.I. 22 at 8–10). Defendants urge the court to reject this explanation, as there are no "ongoing" contractual relationships that a declaration could "guide." (D.I. 23 at 3).

The court begins by noting that, although the First Amended Complaint brings this claim under Del. Code tit. 10, § 6501, (*see* D.I. 16 at 17 ("Declaratory Judgment Pursuant To Pursuant To [sic] 10 Del. C. § 6501")), the parties' arguments appear to rely on caselaw regarding the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), which differs from the Delaware Declaratory Judgment Act. In any event, whether under the Federal Act or the Delaware Act, the court concludes that dismissal of Plaintiffs' claim would be premature. While there is necessarily some overlap between Plaintiffs' declaratory judgment claim and the grounds underlying some of Plaintiffs' breach of contract claims—particularly given that they involve questions regarding what amount and type of documentation satisfies Defendants' production-based obligations of the Purchase Agreement—the extent of that overlap remains unclear. Plaintiffs sufficiently allege that declaratory judgment may serve a useful purpose, as Plaintiffs sufficiently allege that the parties may have other conflicts in the future relating to compliance with their obligations that may benefit from the clarity a declaration could provide. The court denies Defendants' motion as to Count II.

C. Unfair Competition

Finally, in Count V, Plaintiffs assert a common law unfair competition claim. (D.I. 16 ¶¶ 103–11). To state an unfair competition claim under Delaware law, a plaintiff must allege "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *CareDx, Inc. v. Natera, Inc.*, No. 19-cv-00662, 2019 WL 7037799, at *12 (D. Del. Dec. 20, 2019). "A tort claim," such as an unfair competition claim, "can be sustained alongside a contract claim where the same conduct constitutes a breach of contract, and a violation of an independent duty imposed by law." *GWO Litig. Tr. v. Sprint Sols., Inc.*, No. N17C-06-356, 2018 WL 5309477, at *11 (Del. Super. Ct. Oct. 25, 2018). Whether a tort can survive alongside a breach of contract claim covering the same conduct depends on whether the "unfair competition claims are based entirely on a duty deriving from the contract," or whether there is "a potential violation of a duty imposed by law separate and apart from the contractual obligations." *Id.*

Plaintiffs allege that Defendants were "unfairly competing with Plaintiffs by facilitating the termination of Plaintiffs' valuable business relationships and diverting revenue from such relationships to itself, instead of having to share revenue with Plaintiffs." (D.I. 16 ¶ 109). Plaintiffs explain that they had "a reasonable expectancy of entering and/or maintaining business relationships with their business partners, actual and/or prospective customers, and employees" which Defendants were aware of. (*Id.* ¶ 105; *see id.* ¶¶104–06). According to Plaintiffs, Defendants have

"made [their] intent to unfairly compete with Plaintiffs clear through [their] conduct related to the Contingent Consideration Payments and breaches of the Purchase Agreement." (*Id.* ¶ 106). Further, Plaintiffs allege that Defendants had, for example, targeted companies that Plaintiffs had relationships with, including Lowe's, to "induce them to terminate their business relationships with Plaintiffs." (*Id.* ¶ 108; *see id.* ¶¶ 103–11).

Defendants argue that Count V should be dismissed because Plaintiffs' unfair competition claim relies "entirely on the alleged duties under the Purchase Agreement," and "[t]ort claims such as unfair competition are only actionable in addition to a contract claim where the conduct violates an independent legal duty separate from the contract." (D.I. 20 at 15 (first citing *GWO Litig. Tr.*, 2018 WL 5309477, at *12; and then citing D.I. 16 ¶ 106)). Defendants also argue that Plaintiffs only allege vague and conclusory allegations of relationships with unknown parties, which is insufficient to show a reasonable expectancy. (*Id.* at 16–17). And while Plaintiffs allege a specific relationship with Lowe's, Defendants emphasize that after the Purchase Agreement, Plaintiffs and Lowe's no longer had a relationship. (*Id.*). Finally, Defendants contend that Plaintiffs fail to allege how Defendants wrongfully interfered with any relationships. (*Id.* at 17–18).

Plaintiffs emphasize that they have pled all necessary elements for an unfair competition claim and that this claim is independent of their breach-of-contract claim. First, Plaintiffs argue that even if the conduct serving as the basis for their unfair-competition claim could also constitute a breach of contract, such a claim is

independent because it involves facts beyond the various agreements and because a breach-of-contract claim would not fully redress their harm. (D.I. 22 at 16–18). Second, Plaintiffs point out that the Purchase Agreement did not transfer *all* of Plaintiffs' relationships with Lowe's, and so they maintained a reasonable expectancy of business. (*Id.* at 18). And third, Plaintiffs contend that, while the precise nature of Defendants' interference will be further uncovered through discovery, "[w]rongful or malicious behavior" sufficient to survive the present motion can be inferred from conduct such as the "disappearance of Contingent Consideration Payments" despite Defendants' press release announcing an increase in profitability. (*Id.* at 18–19).

The court finds Plaintiffs' allegations sufficient to survive Defendants' motion to dismiss. Plaintiffs allege that they had a reasonable expectancy of entering and continuing their business relationships with their business partners, including with Lowe's, customers, and employees; that Defendants interfered with these business relationships, including Lowe's, by inducing these parties to terminate their relationships with Plaintiffs to gain a wrongful competitive advantage; and that this harmed Plaintiffs by facilitating the termination of these business relationships. (D.I. 16 ¶¶ 103–11). These allegations are sufficient to raise "a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (cleaned up). The court also finds that whether this unfair competition claim is based on conduct and obligations that are not independent from its breach of contract claims is best determined at a later stage once the parties are able to further develop their arguments as to the proper interpretation of the various

contractual provisions. Considering all of Plaintiffs' allegations together, this court finds Plaintiffs have satisfied their burden. *Iqbal*, 556 U.S. at 678. Defendants' motion to dismiss as to Count V is denied.

D. Jury Demand

Alternatively to the motion to dismiss, Defendants seek to strike Plaintiffs' jury demand. (D.I. 20 at 19–20). Defendants argue that the terms of the Purchase Agreement contain an explicit basis for striking Plaintiffs' jury trial demand. Section 14.2 of the Purchase Agreement provides:

> EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(D.I. 16-1 at 111, § 14.2). Defendants contend that all of Plaintiffs' claims arise from, or are related to, the Purchase Agreement and therefore fall within the waiver provision. (D.I. 20 at 20). Plaintiffs disagree, arguing that Count IV's claims rest on breaches of the Amended Advisory Agreement and Settlement Agreements and therefore do not arise out of or otherwise relate to the Purchase Agreement. (D.I. 16 ¶ 58).

The Seventh Amendment of the United States Constitution protects the right to a jury trial in civil cases. *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212 222 (3d Cir. 2007). "Because the 'right of jury trial is fundamental, courts indulge every reasonable presumption against waiver.'" *Id.* (quoting *Aetna Ins. Co. v. Kennedy*

*ex rel. Bogash*, 301 U.S. 389, 393 (1937)). Parties may nonetheless waive this right so long as the waiver is knowing and voluntary. *Id.*

Plaintiffs do not dispute the validity of the jury trial waiver or otherwise allege that it was entered into unknowingly or involuntarily. (*See* D.I. 16 ¶ 58 (asserting that claims were pled that do not fall within the waiver's scope)). Rather, the parties' dispute concerns the scope of the jury trial waiver and whether it encompasses all claims asserted in the First Amended Complaint. (*See* D.I. 20 at 19–20; D.I. 22 at 20). Plaintiffs' argument that Count IV involves facts and circumstances separate from the Purchase Agreement presents factual issues that this court can more effectively address following discovery. For this reason, and given the strong presumption against waiving a jury trial, *Aetna*, 301 U.S. at 393, the court denies the Defendants' Motion to Strike the Plaintiffs' jury trial demand without prejudice. Defendants are free to renew their request following discovery. *Cf. Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 181–82 (W.D. Pa. 2020).

## IV. CONCLUSION

For these reasons, Defendants' motion to dismiss is denied without prejudice for all claims, except for Plaintiffs' claims based on a breach of an implied duty of good faith and fair dealing under Counts I and III, which is granted. Defendants' alternative motion to strike is denied.